**NOT RECOMMENDED FOR PUBLICATION**
File Name: 18a0166n.06

No. 17-1233

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| KIMBERLY J. GUEST-MARCOTTE, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Mar 30, 2018 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | |
| LIFE INSURANCE COMPANY OF NORTH | ) | ON APPEAL FROM THE |
| AMERICA; METALDYNE SALARY | ) | UNITED STATES DISTRICT |
| CONTINUATION PLAN; METALDYNE | ) | COURT FOR THE EASTERN |
| POWERTRAIN COMPONENTS, INC.; SHORT | ) | DISTRICT OF MICHIGAN |
| TERM DISABILITY INCOME PLAN OF | ) | |
| METALDYNE, LLC, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

**BEFORE:** **NORRIS, ROGERS, and THAPAR, Circuit Judges.**

**ROGERS, Circuit Judge.** Kimberly Guest-Marcotte suffers from Ehlers-Danlos Syndrome Type III, a hereditary disease characterized by loose connective tissue and frequent joint dislocations and subluxations. In June 2013, she applied for short-term disability benefits due to the chronic pain and fatigue caused by her disease. The administrator of her disability plan, Life Insurance Company of North America ("LINA"), denied her claim without exercising its right to have Guest-Marcotte physically examined by one of its doctors. Because Guest-Marcotte suffers from an objectively verifiable disease which is medically known to cause chronic pain, and which Guest-Marcotte's doctors have repeatedly concluded to be disabling,

LINA's refusal to conduct a physical examination of Guest-Marcotte rendered its denial arbitrary and capricious.

**I.**

Guest-Marcotte is forty-two years old. From 2005 until her termination in November 2013, she was employed as an insurance risk manager by Metaldyne, LLC, a designer and supplier of metal engine components. As a Metaldyne employee, she was covered by Metaldyne's Salary Continuation Plan (the "Plan").[1] Under the terms of the Plan, covered employees are entitled to receive short-term disability benefits ("STD benefits") equal to their base salary for up to 26 weeks "during an approved disability absence." The Plan defines "disabled" as follows:

> You are considered Disabled if, solely because of a covered Injury or Sickness, you are:
> - Unable to perform the material duties of your Regular Occupation; and
> - Unable to earn 80% or more of your Covered Earnings from working in your Regular Occupation.

The Plan further states that the employee "must provide the claims administrator, at [the employee's] own expense, satisfactory proof of Disability before benefits will be paid."

The Plan designates Metaldyne, LLC as the plan administrator, and provides Metaldyne in this role with authority to "make rulings, interpret the Plan, prescribe procedures, gather needed information, . . . and generally do all other things which need to be handled in administering the Plan." Defendant LINA is the Plan's claims administrator. The Plan grants

---

[1] For reasons not entirely clear, the Plan itself is not part of the record in this case. Instead, the record contains only a summary description of the Plan, which the parties have each treated as if it were the relevant plan document. Therefore, all references in this opinion to the terms of the Plan are to the terms of the summary plan description.

The record also contains two other documents, one entitled "Short Term Disability Income Plan of Metaldyne, LLC," and the other "Short Term Disability Income Plan for the Employees of Metaldyne, LLC." These documents are not at issue in this case.

LINA the authority to "require a medical examination, at its own expense and as often as [it] may reasonable require."

Guest-Marcotte has experienced joint pain since childhood. In early 2012, her primary care physician, Dr. Phillip Kadaj, diagnosed her with EDS Type III. EDS Type III is a hereditary disorder that causes loose and weakened connective tissue. Common symptoms include hyperflexible and unstable joints, and EDS Type III is medically known to cause frequent joint dislocations and subluxations as well as chronic pain and fatigue.

Dr. Kadaj initially referred Guest-Marcotte to a rheumatologist. When she returned to see Dr. Kadaj on May 7, 2013, she reported neck pain with radiation to the top of her head and back, hotness and numbness from her shoulder to her elbow, and weakness in her upper extremities. Dr. Kadaj again determined that she had EDS Type III and referred her to an EDS specialist in Chicago, Dr. Bradley Tinkle.

Dr. Tinkle is a clinical geneticist and a recognized expert on EDS, and he has authored several books on EDS and given numerous speeches and presentations on the topic. He examined Guest-Marcotte on May 22, 2013. His notes from that visit indicate she reported pain in her lower back, neck, knees, and throughout her legs, along with multiple dislocations of her hips, ribs and shoulders, and subluxations of her knees and ankles. She also complained that she was having trouble sleeping, which caused her chronic fatigue, and that she was experiencing tingling and numbness in her legs. Dr. Tinkle diagnosed her with EDS Type III, as well as polyarticular joint pain, temporomandibular joint-pain dysfunction syndrome, and fatigue. In addition, a cervical spine MRI showed disc degeneration of C3-C4,[2] C4-C5, and C5-C6, as well as herniation of C4-C5 resulting in "moderate central canal stenosis." Dr. Tinkle recommended

---

[2] C3-C4 refers to the intervertebral disc between the C3 and C4 vertebrae.

that Guest-Marcotte begin physical therapy, work on her posture, start taking an anti-inflammatory medication, and apply for short-term disability benefits "in order to rest, obtain the [suggested] multiple consultations, and to start the recommended therapies."

Guest-Marcotte took Dr. Tinkle's advice and applied for STD benefits on June 6, 2013. In support of her application, Dr. Tinkle submitted a Medical Request Form indicating that her primary diagnosis was EDS and that the specific factors impacting her return to work were "multiple joint pains," "cervical disc degeneration," "poor sleep," and "chronic fatigue." He imposed the following work restrictions: (1) "avoid repetitive stress"; (2) "no lifting, pushing, [or] pulling" five pounds or more; and (3) she would have to be able to take "frequent breaks." He opined that Guest-Marcotte would be able to return to work if these restrictions could be accommodated.

Dr. Kadaj also submitted a Medical Request Form listing Guest-Marcotte's primary diagnosis as EDS, and stating that the specific factors impacting her return to work were limited functional capacity and chronic pain. He imposed work limitations of: (1) no sitting prolonged periods; (2) no standing prolonged periods; (3) no lifting more than ten pounds; and (4) no pushing or pulling. Dr. Kadaj opined that she could not return to work even with accommodations because her pain was "severe/limiting" and it was not reasonable for her to sit more than two hours at her job.

LINA made its initial decision to deny benefits on August 2, 2013. The record shows that LINA assigned Nurse Case Manager Sarah Drudy and physician reviewer Dr. Paul D. Seiferth, MD to review Guest-Marcotte's file. Drudy observed that the medical evidence on file "[did] not demonstrate a functional loss beyond incur [sic]." She also noted that, although Guest-Marcotte was diagnosed with EDS, her physical exam findings were "unremarkable." Dr.

Seiferth wrote that the examination findings were "remarkable for TMJ [temporomandibular joint] crepitation, normal extremity range of motion, and strength, [and] hyper-mobility of joints on the Beighton scale 5/9." He also noted that imaging had shown "central cervical spine stenosis at C4-5 with no clinically correlated signs," but emphasized that her condition "is not noted to have worsened at incur and Ms. Guest-Marcotte was functional at a sedentary demand level."

LINA's denial letter defined "disability" in a way that was similar, but not identical, to the definition of disability found in the Plan.[3] The letter explained LINA's reasons for denying Guest-Marcotte's claim as follows:

> [T]he medical documentation received and reviewed by our staff failed to support a functional impairment of such severity that would preclude you from working in your own occupation as a Senior Risk Analyst. Please understand we are in no way stating your symptoms do not exist, however, there is no documentation of a functional deficit. Additionally, there is no diagnostic testing on file to support your diagnosis.

After LINA's initial denial, Guest-Marcotte appealed and offered more medical evidence of her disability. Dr. Kadaj submitted numerous medical records to LINA, including office notes from several visits that Guest-Marcotte made throughout 2013. These treatment notes indicate she consistently complained of severe chronic pain, especially in her neck, back, and joints. In particular, Guest-Marcotte visited Dr. Kadaj on September 9, 2013, after both her shoulders had popped out of place during the previous night. Although this had happened before and she was normally able to get them back into place, this time she had only been able to reset her left shoulder and was having difficulty moving her right arm.

---

[3] The erroneous definition provided in the denial letter was: "An Employee is Totally Disabled if, because of Injury or Sickness, he or she is unable to perform all the substantial and material duties of his or her regular occupation, or solely due to Injury or Sickness, is unable to earn more than 80% of his or her Indexed Covered Earnings."

Dr. Kadaj also sent LINA the results of several MRIs taken in May and July 2013. These MRIs showed that Guest-Marcotte suffered from moderate central canal stenosis and some mild disc degeneration, but were otherwise normal. Dr. Kadaj further included the results of two electromyography tests, one done on June 20, 2013 and the other on July 15, both of which showed "[n]o evidence of radiculopathy, myopathy, generalized or focal peripheral neuropathy, or plexopathy."

On June 17, 2013, LINA had written to Dr. Tinkle asking for "clinical exam findings or diagnostic testing to correlate [his] imposed restrictions and limitations." LINA sent a follow-up on August 6 indicating it had not yet received Dr. Tinkle's response. Dr. Tinkle responded on August 11, but his reply did not explain what clinical exam findings or diagnostic testing supported Guest-Marcotte's work restrictions. Dr. Tinkle did write to LINA on August 12, however, to explain that Guest-Marcotte had "multiple subluxations and dislocations consistent with her EDS diagnosis." He also noted that she had "advanced degenerative changes in her cervical discs, . . . [and] the chronic fatigue, sleep disturbance, and pain to qualify for a diagnosis of chronic pain syndrome." Further, he explained that persons with EDS "can have subluxations or dislocations with minimal trauma and often utilize their major muscle groups to do even the smallest tasks leading to poor mechanics, pain, muscle spasms, and fatigue." Dr. Tinkle reiterated that Guest-Marcotte should "still not . . . lift/push/pull objects of greater than 5 pounds," and that she should "avoid repetitive motions, and . . . take frequent breaks." He admitted, however, that he "did not do any functional testing as [he was] not certified in this area and it ha[d] been [his] experience that these patients can vary tremendously on such evaluations depending on [various factors]."

LINA also received a letter, dated August 8, from Guest-Marcotte's acupuncturist, Courtney Wilkinson, explaining that Guest-Marcotte suffered from severe joint and muscle pain that had "progressively worsened since February 2013" and made it "nearly impossible to complete daily tasks which involve repetitive movements," such as using a computer mouse.

The record further contains a document authored by Guest-Marcotte's physical therapist, Sheila Isles-Truax, which is entitled "Plan of Care." This document noted that Guest-Marcotte was having "shoulder impingement and chronic subluxation of both shoulders" and "instability of her ribs bilaterally." It further stated that her lower back was "aggravated significantly by sitting activities" and she was having "great difficulty sleeping due to the severity of her pain." Isles-Truax diagnosed Guest-Marcotte with "moderate to severe hypermobility in her cervical spine, bilateral shoulders, bilateral knees, and . . . lumbar spine." The document also indicated that Guest-Marcotte had "deficits in rotator cuff strength, core strength, and cervical and lumbar spine, as well as general strength in the lower extremities." In particular, she lacked the cervical/lumbar stability and shoulder strength necessary "to tolerate driving or sitting work tasks."

Dr. Kadaj wrote again to LINA on August 19, 2013, offering his "professional opinion that Ms. Guest-Marcotte is unable to work due to limited functional capacity and chronic pain." He also sent a Healthcare Provider Questionnaire, which stated that Guest-Marcotte had "Ehlers Danlos Syndrome with associated chronic pain [and] fatigue." He opined that she had a "lifelong condition" and that her "chronic pain and fatigue . . . limit[] mobility and functional capacity." He further wrote that she was "unable to sit or stand for long periods of time," she could not perform the essential functions of her job with or without a reasonable

accommodation, and "[i]t is unlikely she will recover fully/sufficiently" to perform her job functions even with accommodations.

On October 4, 2013, the physical therapist, Isles-Truax, wrote to LINA to explain that Guest-Marcotte had twice recently dislocated her shoulders, and had "rolled" her ankle four times due to instability. The letter emphasized the "severity" and "complicated, painful, and difficult" nature of Guest-Marcotte's condition. It further noted that she was working on her stability and strength in an effort to avoid surgeries such as spinal fusions and discectomies.

LINA denied Guest-Marcotte's appeal on November 21, 2013. This time, her file was reviewed by Dr. Nick Ghaphery, D.O., and also again by Nurse Case Manager Drudy. Drudy noted that, although Guest-Marcotte had submitted documentation showing "multiple subluxation[s] and dislocations" and that she suffered from "fatigue, anxiety, muscle spasm[s], pain and poor body mechanics," she had provided "no updated and/or current medical information, diagnostic testing, labwork, etc., indicating [the] nature of [her] functional loss." Dr. Ghaphery added:

> Although the cervical MRI, dated 5/11/13, reveals moderate central canal stenosis at C4-C5, this would not preclude functional demands. EMG, dated 6/20/13, does not demonstrate evidence of radiculopathy, myopathy, or peripheral neuropathy. Labs reviewed do not demonstrate any significant abnormalities that would preclude functional demands. Although the office note from Dr. Kadaj, dated 9/9/13, indicates limited right shoulder motion in abduction, and abnormal joint palpitation, there are no quantified measurable strength or functional deficits documented to support the restrictions. Although the ["Plan of Care" document written by Isles-Truax] demonstrates impairment of hand grip strength, the noted deficits in rotator cuff strength, core strength, and the lower extremities are not quantified to demonstrate impairment. Letter from Courtney Wilkinson, acupuncturist, dated 8/8/13, while indicating overall joint pain, and weakness, that is not quantified, does not provide detailed strength deficits to support the restrictions.

LINA's second denial letter noted that Guest-Marcotte's occupation required "Sedentary demand activities according to the Dictionary of Occupational Titles." The letter used the same

erroneous definition of "disability" that LINA had included in its first denial letter. In explaining this second denial, LINA again relied on Guest-Marcotte's failure to provide objective medical evidence to support the existence of functional limitations. The letter reasoned that her moderate central canal stenosis "would not preclude functional demands," and noted that Dr. Kadaj's September 9 office notes provided "no quantified measurable strength or functional deficits." Similarly, the "Plan of Care" document authored by Isles-Truax did not quantify her deficits in "rotator cuff strength, core strength, and the lower extremities" so as to demonstrate impairment. The letter from Wilkinson, the acupuncturist, did not quantify Guest-Marcotte's joint pain and weakness. In sum, there were "no significant clinical findings identified to support a loss of function," and "the medical information on file [did] not support the severity of a disabling condition."

The day after this denial, Metaldyne terminated Guest-Marcotte's employment. In its termination letter, Metaldyne explained that Dr. Kadaj had stated she was "unlikely to recover fully/sufficiently to perform the functions of [her] position." In light of the "unknown nature of [Guest-Marcotte's] ability to perform [her] job functions in the future, and the unknown timing of [her] ability to return to work," Metaldyne opted to fire her.

Guest-Marcotte then took a second appeal. In support of this appeal, Jeff Deitrick, who provided counseling services to Guest-Marcotte, wrote a letter in which he noted that Guest-Marcotte had described "hip dislocations during her commutes to and from work, discs in her neck being 'out,' shoulder dislocations, pain from too much sitting, lack of sleep due to pain, 'nerve' pain in her legs and feet, pain in her back, and pain in her neck."

In July 2014, Dr. Tinkle and Dr. Kadaj both submitted affidavits supporting Guest-Marcotte's new appeal. Dr. Kadaj averred that she had the following limitations and restrictions

which disabled her from employment: (1) she could not drive a vehicle for more than 60 minutes due to chronic fatigue and pain which reduced her ability to concentrate; (2) she could not sit in a stationary position for more than 60 minutes because the inactivity would exacerbate her joint pain and, in turn, her fatigue; (3) she could not engage in "most repetitive motion activities," including typing and using a computer mouse, for more than 60 minutes at a time because doing so would exacerbate her pain and fatigue; and (4) she could not do any activity requiring "high mental acuity and/or strong speaking skills" for more than 20 minutes because she "was in constant pain which was distracting when mental focus was required." Dr. Tinkle imposed even more stringent limitations, as he believed she could not drive more than 30 minutes, could not sit in a stationary position for more than 20 minutes, could not engage in repetitive motion activities for more than 20 minutes, and could not perform activities requiring high mental acuity or strong speaking skills for more than 20 minutes.

Guest-Marcotte also now submitted office notes from her visits to Dr. Blake Bergeon, whom she saw three times in 2013 after being referred by Dr. Kadaj. Dr. Bergeon's treatment notes from the first visit, on June 10, 2013, indicate that Guest-Marcotte complained of "diffuse body pain, particularly in the neck but throughout the shoulder girdle and upper extremities, as well as the lumbar region and lower extremities." Dr. Bergeon noted that he reviewed Guest-Marcotte's MRI, and it showed "some early age expected degenerative disc change without significant structural abnormality except for mild central posterior disc bulging at C4-5," as well as possibly a "minimal central canal stenosis." An examination revealed no musculoskeletal structural abnormality. He did, however, find "typical signs of diffuse ligamentous hyperlaxity," as well as indications of fibromyalgia. Continuing with the exam, Dr. Bergeon noted that Guest-Marcotte had "pain with proximal muscle testing but no focused weakness." As for her

neurologic symptoms, Dr. Bergeon recorded normal strength in all myotomes in both the upper and lower extremities, normal and symmetrical deep tendon reflexes, and a normal sensory examination in all dermatomes in the upper and lower extremities. Both a Spurling's test and a Hoffman's test were negative.[4] Dr. Bergeon's impression was: (1) chronic pain syndrome; (2) diffuse ligamentous hyperlaxity; and (3) fibromyalgia syndrome.

Dr. Bergeon saw Guest-Marcotte again on June 20, 2013. There was "[n]o change in her symptoms overall," although Guest-Marcotte now "describ[ed] . . . burning dysesthetic quality pain" in her legs. Dr. Bergeon further noted that she had "persistent radicular symptoms to the [lower extremities], which have been recalcitrant to conservative treatment so far." Dr. Bergeon performed an electromyogram test, which was "entirely normal." His impression remained unchanged: chronic pain syndrome with "underlying Ehlers-Danlos syndrome and diffuse ligamentous laxity syndrome . . . [and] fibromyalgia."

Finally, Dr. Bergeon examined Guest-Marcotte on July 15, 2013. Again, there was "[n]o significant change in her symptoms." She complained of a "burning sensation" in her right arm, and "remain[ed] symptomatic in all four extremities, as well as diffusely through the trunk [with] associated headaches." Dr. Bergeon reviewed an MRI of her lumbar spine, which was "essentially normal." Updated X-rays of the lumbar and cervical spine and an electromyogram test were also normal. Dr. Bergeon again had a similar impression of EDS Type III resulting in diffuse ligamentous hyperlaxity, along with fibromyalgia and headaches.

---

[4] A Spurling's test is used "to assess nerve root compression and cervical radiculopathy by turning the patient's head and applying downward pressure. A positive Spurling's sign indicates that the neck pain radiates to the area of the body connected to the affected nerve." *Shaw v. AT & T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 542 n.1 (6th Cir. 2015). A positive Hoffman's test is "an indicator of a number of neurological conditions including cervical spondylitis, other forms of spinal cord compression, and multiple sclerosis." *Hayward v. Comm'r of Social Sec.*, No. 1:11-cv-68, 2012 WL 851155, at *3 n.3 (W.D. Mich. Mar. 12, 2012).

LINA denied Guest-Marcotte's second appeal on October 22, 2014. Her file was reviewed this time by Dr. Shadrach Jones, M.D., who noted the following:

- Dr. Tinkle's August 12 letter "did not document any specific physical findings or impairments that would preclude the required occupational functional abilities."
- The restrictions Dr. Tinkle placed on Guest-Marcotte were "not supported by documented impairment."
- Dr. Kadaj's June 4, 2013 office examination was "a normal physical examination," in that Guest-Marcotte's lungs were clear, her heart sounded normal, and there was no swelling in her extremities.
- The restrictions imposed by Dr. Kadaj in his Medical Request Form were "not supported by documented impairment."
- Dr. Bergeon's exams showed "no structural abnormality or joint effusion" and "no focal weakness or other neurologic abnormality."
- Dr. Bergeon encouraged "active independent exercise" and placed no restrictions or limitations on Guest-Marcotte.

Dr. Jones concluded that "the current objective or quantifiable clinical examination[s], clinical diagnostic testing, or imaging documentations do not support a significant ongoing physical functional impairment which would preclude claimant from performing her own occupational duties."

LINA's latest denial letter again used the same incorrect definition of "disability." In explaining the decision, LINA's letter began by emphasizing Dr. Bergeon's office notes, and his conclusion that Guest-Marcotte's MRI, X-rays, and EMG were "essentially normal." It then discussed Dr. Kadaj's July 22, 2013 office notes, which recorded a physical exam that was "within normal limits," and in which Guest-Marcotte showed "no acute distress and [there was] no edema or varicosities noted in the extremities." The letter concluded: "While we understand that your client has Ehlers-Danlos Syndrome, the clinical findings and test results do not document her physical impairments. There was no clinical evidence that would demonstrate a functional loss and inability to perform her sedentary occupation beginning 6/6/13."

**II.**

Guest-Marcotte filed this action under the Employee Retirement Income Security Act ("ERISA") against LINA, Metaldyne Salary Continuation Plan, Metaldyne Powertrain Components, Inc., and Short Term Disability Income Plan of Metaldyne, LLC (collectively, "defendants"), contending that she was improperly denied STD benefits. Guest-Marcotte sought discovery on the issue of whether LINA was biased or operating under a conflict of interest, but the district court denied this request. The parties thereafter filed competing motions for judgment on the administrative record. The defendants' motion included a counterclaim for $7,286.29 in benefits Metaldyne had paid Guest-Marcotte while her application was pending.

On December 1, 2016, the magistrate judge issued a report and recommendation, which recommended granting the defendants' motion for judgment and their counterclaim. The report and recommendation first concluded that LINA's denial of benefits was not arbitrary and capricious because it was reasonable for LINA to require Guest-Marcotte to produce objective medical evidence of her functional impairment, and Guest-Marcotte had not done so. The magistrate determined that LINA did not act unreasonably in declining to conduct a physical examination, because a file review is not inherently objectionable and LINA did not make any credibility judgments. The report and recommendation also concluded that Metaldyne should prevail on its counterclaim, because the Plan expressly reserved Metaldyne's right to take "any legal action needed to recover [an] overpayment," and, based on LINA's now-upheld benefits denial, Guest-Marcotte had in fact received an overpayment.

Guest-Marcotte objected to the report and recommendation, but the district court adopted it on January 6, 2017 and entered judgment for the defendants.[5]  This timely appeal followed.

## III.

LINA's review of Guest-Marcotte's benefits claim was arbitrary and capricious.  Under the terms of the Plan, LINA had the option to conduct a physical examination; yet it elected to discount Guest-Marcotte's claims of disabling pain without exercising that option, even though it is undisputed that she has a hereditary disease known to cause chronic and severe pain, and she submitted a host of evidence indicating she in fact suffers from such pain.

Section 502 of ERISA permits a plaintiff to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  When "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," we review a section 502 claim under the arbitrary-and-capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Here, all agree that the Plan contains language triggering arbitrary-and-capricious review.

---

[5] The district court held that Guest-Marcotte raised only general objections to the report and recommendation, and overruled them on that basis.  Only specific objections to a magistrate's report and recommendation are preserved for appellate review. *Smith v. Detroit Fed'n of Teachers, Local 231, Am. Fed'n of Teachers, AFL-CIO*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A party forfeits her appeal by making only "a general objection to the entirety of a magistrate's report." *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 508–09 (6th Cir. 1991).  Here, Guest-Marcotte has not challenged the district court's finding that her objections to the report and recommendation were general in nature.  Therefore, her appeal would have been forfeited had the defendants raised the issue.  The defendants, however, did not raise this issue in their brief before this court, and so they have forfeited their forfeiture argument.  This is so because the specific-objection requirement is not jurisdictional, but rather is rooted in this court's supervisory powers, *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Howard*, 932 F.2d at 508; *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981), and therefore can be forfeited.

Arbitrary-and-capricious review is very deferential. "Under the arbitrary-and-capricious standard, we must uphold the plan administrator's decision if it is 'the result of a deliberate, principled reasoning process' and 'supported by substantial evidence.'" *Shaw v. AT & T Benefit Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015) (quoting *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 444 (6th Cir. 2009)). Our review, however, "is not a 'rubber stamp of the administrator's decision.'" *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007) (quoting *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (alteration adopted)). We look to several factors to evaluate the rationality of the administrator's decision-making process: "the quality and quantity of the medical evidence; the existence of any conflicts of interest; whether the administrator considered any disability finding by the Social Security Administration; and whether the administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant." *Shaw*, 795 F.3d at 547 (quoting *Fura v. Fed. Express Corp. Long Term Disability Plan*, 534 F. App'x 340, 342 (6th Cir. 2013) (internal quotation marks omitted)).

LINA's decision to deny STD benefits was arbitrary and capricious because LINA had the option to conduct a physical examination, yet declined to do so even though there was a clear medical consensus that Guest-Marcotte suffered from EDS Type III—a disease medically known to cause chronic and severe pain—and abundant evidence that she in fact experienced such pain. Our cases emphasize that "the failure to conduct a physical examination, where the Plan document gave the plan administrator the right to do so, 'raises questions about the thoroughness and accuracy of the benefits determination.'" *Id.* at 550 (quoting *Helfman v. GE Grp. Life Assurance Co.*, 573 F.3d 383, 393 (6th Cir. 2009) (alteration adopted)). In particular, when an employee contends that she is disabled by chronic pain, and the relevant ERISA plan gives the

administrator the right to physically examine the employee, we have held that a plan administrator's decision to discount those complaints of pain without conducting a physical examination "weighs in favor of a determination that the denial of [the employee's] claim was arbitrary and capricious." *Godmar v. Hewlett-Packard Co.*, 631 F. App'x 397, 407 (6th Cir. 2015); *see Shaw*, 795 F.3d at 550; *Fura*, 534 F. App'x at 343; *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263–64 (6th Cir. 2006); *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 297 n.6 (6th Cir. 2005). While it is true that "there is 'nothing inherently objectionable about a file review by a qualified physician,'" we have repeatedly cautioned that plan administrators should not make "credibility determinations concerning the patient's subjective complaints without the benefit of a physical examination." *Smith*, 450 F.3d at 263 (quoting *Calvert*, 409 F.3d at 296).

Here, the Plan expressly gives LINA the right to "require a medical examination, at its own expense and as often as [it] may reasonably require." On the facts of this case, LINA should not have discounted Guest-Marcotte's claims of disabling chronic pain without exercising that right. Guest-Marcotte has been diagnosed with EDS Type III numerous times by numerous medical professionals—including Dr. Tinkle, a renowned expert on the disease—and EDS is known to cause severe and chronic pain. Indeed, LINA has never disputed the fact that Guest-Marcotte has EDS. These diagnoses provided good reason to believe that Guest-Marcotte actually suffered from debilitating pain, and multiple doctors informed LINA that the pain would make it impossible for Guest-Marcotte to drive, sit still, or concentrate for extended periods. Under these circumstances, it was not reasonable for LINA to brush aside her claims of debilitating pain without first performing a physical exam.

LINA responds that it did not make a credibility determination: while LINA concedes that Guest-Marcotte subjectively feels pain, it maintains that she nevertheless failed to prove

through objective evidence how her pain renders her unable to do her job. In other words, LINA argues that it could reasonably accept Guest-Marcotte's subjective reports of pain, yet still demand that she produce objective evidence of how that pain limited her functionality. This logic is flawed, however, because Guest-Marcotte's fundamental claim is that her pain is so severe and persistent that it precludes her from sitting still and concentrating long enough to do her desk job. To deny her benefits, LINA necessarily had to disbelieve this claim, and that is the essence of a credibility determination.

LINA also argues that the Plan places the burden on Guest-Marcotte to offer "satisfactory proof" of her disability, and that Guest-Marcotte is impermissibly attempting to shift her burden to LINA by requiring LINA to conduct a physical examination to prove she is *not* disabled. However, this argument distorts the language of the Plan. While it is true that the Plan requires Guest-Marcotte to demonstrate her disability by "satisfactory proof," nowhere does the Plan specify that only proof of objectively observable limitations will suffice. Guest-Marcotte has offered plenty of proof that she suffers from EDS, which causes severe chronic pain that could well make it impossible for her to perform the mental functions of her job. She has, at the very least, produced enough evidence of her disability to require LINA to respond by conducting a physical examination. That distinguishes this case from cases like *Filthaut v. AT & T Midwest Disability Benefit Plan*, No. 16-2707, 2017 WL 4511487, at * 7 (6th Cir. Oct. 10, 2017), in which the claimant wholly failed to produce objective medical evidence of her condition, and (unlike Guest-Marcotte's plan) such evidence was explicitly required by the plan, *see id.* at *1, *5.

This is also not a case where the claimant suffers from a disease which can be difficult to diagnose objectively, like fibromyalgia or back pain. For this reason, LINA's reliance on our

fibromyalgia and back-pain caselaw is misplaced. LINA cites *Rose v. Hartford Financial Services Group, Inc.*, 268 F. App'x 444, 453 (6th Cir. 2008), in which we observed that "it is entirely reasonable for an insurer to request objective evidence of a claimant's functional capacity." LINA argues that, under *Rose*, it was entitled to insist that Guest-Marcotte produce objective evidence of how her pain impacted her ability to work, and that, in the absence of such evidence, it reasonably denied her claim based on a file review. *Rose*, in turn, cited our decision in *Cooper v. Life Insurance Company of North America*, 486 F.3d 157, 166 (6th Cir. 2007), for the proposition that "[r]equiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable." The instant case, however, is distinguishable from *Rose* and *Cooper*. The employee in *Rose* had, among other conditions, fibromyalgia and chronic fatigue syndrome. 268 F. App'x at 448. In *Cooper*, the employee suffered from lower back pain. 486 F.3d at 159. Fibromyalgia, chronic fatigue syndrome, and back pain are all notoriously difficult to diagnose through objective medical evidence. *See Rose*, 268 F. App'x at 454 (noting that fibromyalgia and chronic fatigue syndrome "are diagnosed through an evaluation of an individual's subjective complaints of pain"); *Cooper*, 486 F.3d at 173 (Sutton, J., concurring in part). In evaluating these kinds of disability claims, a requirement that the employee produce objective evidence of functional limitations may be sensible. In this case, however, no one disputes Guest-Marcotte's diagnosis: all agree she has EDS Type III, a hereditary disease which is medically known to cause frequent joint dislocations and subluxations along with chronic pain. The record shows that Guest-Marcotte has in fact suffered such frequent dislocations and subluxations, which can be reasonably expected to result in significant pain. Under these circumstances, where there is no dispute that the claimant suffers from a genetic disease that

produces severe and chronic pain, it was arbitrary and capricious for LINA to deny her disability claim without exercising its right to conduct a physical examination.

As for the proper remedy, Guest-Marcotte contends that this court should simply award her benefits. However, because she is not clearly entitled to STD benefits under the Plan, the proper remedy is a remand. "'Where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled,' remand to the plan administrator is the appropriate remedy." *Helfman*, 573 F.3d at 396 (quoting *Cooper*, 486 F.3d at 171 (alteration adopted)). Even though LINA's decision-making process was flawed for the reasons identified above, the record does not show that Guest-Marcotte clearly qualifies as disabled within the meaning of the Plan. The correct remedy, therefore, is a remand to permit LINA another chance to conduct a deliberate and principled review of Guest-Marcotte's claim.[6]

In light of our decision to remand, it would be premature to rule on Metaldyne's counterclaim. Whether Metaldyne is entitled to recover overpaid benefits depends on whether those benefits were in fact overpaid. That question will be answered on remand.

Finally, Guest-Marcotte argues that she should be permitted to seek discovery on remand to determine whether LINA is biased or operating under a conflict of interest. The general rule in ERISA denial-of-benefits cases is that the district court's review is limited to the administrative record, and thus discovery is not available. *See Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 430 (6th Cir. 2006). An exception exists, however, if discovery is sought "in

---

[6] Guest-Marcotte also contends that LINA's decision was arbitrary and capricious because of its consistent use of an erroneous definition of "disability." There is no need to address this argument given our conclusion above that LINA's review was flawed for other reasons. On remand, however, LINA should of course be careful to use the correct definition of disability identified at the outset of this opinion.

support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Id.* (quoting *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998)). To be entitled to such discovery, an ERISA claimant must first "provide sufficient evidence of bias—or of any procedural irregularity—to justify prehearing discovery. . . . [A] mere allegation of bias is insufficient to throw open the doors of discovery in an ERISA case." *Likas v. Life Ins. Co. of N. Am.*, 222 F. App'x 481, 486 (6th Cir. 2007) (internal quotation marks omitted). Here, the district court correctly concluded that Guest-Marcotte failed to make the necessary showing because she made only conclusory allegations of bias. As evidence of bias, Guest-Marcotte points to (1) the existence of multiple disability plans, (2) the fact that LINA consistently used the wrong definition of disability, even after being notified of its error, and (3) LINA's incentive to deny the claim because of a "potential large disability payment that the plan would have to pay." First, while the existence of multiple plans may show that the defendants are disorganized, it is not necessarily evidence of LINA's bias. Second, LINA's use of the wrong definition of disability is not sufficient proof of bias because Guest-Marcotte has not shown that the two definitions are materially different in the context of this case. Finally, as the magistrate judge determined, the Plan "is funded through the general assets of Metaldyne and identifies itself as self-funded." LINA accordingly lacks the incentive to deny benefits that Guest-Marcotte claims it has. Guest-Marcotte was properly denied discovery.

## IV.

For these reasons, we reverse the judgment of the district court and remand with instructions for the district court to remand to LINA for a full and fair review of Guest-

Marcotte's claim in accordance with this opinion.  We also reverse the district court's judgment

with respect to Metaldyne's counterclaim.